**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

| | | |
|---|---|---|
| NIXU FL IP PROTECTION LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. _____ |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| INFOBLOX FEDERAL, INC., and | ) | |
| INFOBLOX, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff NIXU FL IP Protection LLC ("Plaintiff" or "NIXU") brings this action for patent infringement against Defendants Infoblox Federal, Inc. and Infoblox, Inc. (collectively "Defendants" or "Infoblox"). Plaintiff alleges as follows:

**NATURE OF SUIT**

1.      This is a claim for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code. Defendants have directly infringed, and continue to infringe, NIXU's issued, valid, and enforceable United States Patent No. 8,898,773 ("the '773 Patent" or "the Asserted Patent"). The Asserted Patent is attached as Exhibit A.

**PARTIES, JURISDICTION, AND VENUE**

**I.      NIXU**

2.      NIXU is a limited liability company organized under the laws of the State of Texas and having a principal place of business at 16690 Collins Ave, Suite 1001, Sunny Isles Beach, FL 33160.

## II.    INFOBLOX

1.      On information and belief, Infoblox Federal, Inc. is a wholly-owned subsidiary of Infoblox, Inc. and is a corporation organized and existing under the laws of Delaware, with its headquarters located at One Dulles Technology Center, 13454 Sunrise Valley Drive, Suite 570, Herndon, VA 20171.

2.      Infoblox Federal, Inc. is registered to conduct business in Virginia and may be served with process via its registered agent in Virginia, located at 7288 Hanover Green Dr Ste A, Mechanicsville, Virginia, 23111-1709.

3.      On information and belief, Infoblox, Inc. is a corporation organized and existing under the laws of Delaware, with its headquarters at 2390 Mission College Blvd., Ste 501, Santa Clara, California 95054. Infoblox, Inc. has an established place of business at One Dulles Technology Center, 13454 Sunrise Valley Drive, Suite 570, Herndon, VA 20171.

4.      Infoblox, Inc. is registered to conduct business in Virginia and may be served with process via its registered agent in Virginia, located at 7288 Hanover Green Dr Ste A, Mechanicsville, Virginia, 23111-1709.

## III.    JURISDICTION AND VENUE

5.      This action arises under the patent laws of the United States, 35 U.S.C. §§ 100, *et seq.* This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

6.      On information and belief, Infoblox makes, develops, builds, configures, installs, uses, distributes, operates, offers to sell, sells and/or imports in the United States, Accused Instrumentalities that utilize the inventions of the Asserted Patent, which are specifically identified in the sections that follow. In addition, Infoblox offers for sale and sells its Accused Instrumentalities to customers directly and indirectly through intermediaries (including resellers,

distributors, and partners), such as, for example, Carahsoft Technology Corp. ("Carahsoft") in Reston, Virginia. On information and belief, Infoblox's customers include public and private sector customers located in Virginia and in this District.

7.      Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(b). Infoblox resides in this District, and/or has committed acts of infringement and has a regular and established place of business in this District. On information and belief, Infoblox, Inc. operates an office campus in this District at One Dulles Technology Center, 13454 Sunrise Valley Drive, Suite 570, Herndon, VA 20171. This location is identified on Infoblox's website. https://www.infoblox.com/company/contact/ (as shown below).



As such, this office constitutes a regular and established place of business for Infoblox, Inc. in this District, and Infoblox, Inc. has committed acts of infringement in this District and in the State of Virginia, including, *at least*, using, offering for sale, and selling the Accused Instrumentalities (as defined in Count I).

8.      Infoblox Federal, Inc. maintains its headquarters at the Herndon, Virginia office, and similarly, has committed acts of infringement in this District and in the State of Virginia,

including, *at least*, using, offering for sale, and selling the Accused Instrumentalities (as defined in Count I) to specific customers, such as U.S. federal government agencies.

9. Infoblox, Inc. and Infoblox Federal, Inc. are subject to specific and general personal jurisdiction in this Court. On information and belief, both companies have sufficient minimum contacts and/or have engaged in continuous, systematic, and substantial activities within this State, including substantial marketing, distribution, and sales of products and services within this District. Furthermore, on information and belief, this Court has personal jurisdiction over Infoblox, Inc. and Infoblox Federal, Inc. because both companies have committed acts of infringement giving rise to NIXU's claims for patent infringement within and directed to this District and the State of Virginia.

10. Employees for both Infoblox, Inc. and Infoblox Federal, Inc. work within this District, including at the Herndon office. On information and belief, these employees have engaged—and continue to engage—in infringing activities, including, but not limited to, making, developing, building, configuring, installing, using, distributing, operating, offering to sell, and/or selling the Accused Instrumentalities. On information and belief, in addition to its Herndon office campus, Infoblox facilitates remote and hybrid work environments for employees throughout Virginia and in this District, such as, for example, in Arlington, Ashland, McLean, Henrico, and Richmond. For example, Ross Gibson is described on Infoblox's website as a Principal Global Subject Matter Expert (SME) in the area of DNS architecture at Infoblox, Inc. and is identified as based in Richmond, Virigina. Mr. Gibson's LinkedIn Profile states he "is currently working as a Principal Global SME for Infoblox *designing DNS*, DHCP, and IP Address Management (DDI) systems for companies ranging from a few thousand users to the world's largest international enterprises." (emphasis added). Mr. Gibson also is identified as a co-author of the recent NIST

DNS guidance: National Institute of Standards and Technology ("NIST") SP 800-81 Rev. 3: Secure Domain Name System (DNS) Deployment Guide, *available at* https://doi.org/10.6028/NIST.SP.800-81r3. The Herndon office and the home offices of Infoblox's employees who work remotely in this District constitute regular and established places of business for Infoblox in this District.

11.     On information and belief, the operations of Infoblox, Inc. and Infoblox Federal, Inc. are closely intertwined as evidenced by, for example, overlapping product offerings on which NIXU's infringement allegations are based, the shared Herndon office location, and the sharing of certain corporate officers and directors. For example, Hoke Horne serves as Chief Financial Officer and Director of Infoblox, Inc. and serves as a Director of Infoblox Federal, Inc.; similarly, Wei Chen serves as Chief Legal Officer and Executive Vice President of Government Affairs for Infoblox, Inc. and serves as a Director of Infoblox Federal, Inc.

12.     On information and belief, Infoblox has directed, and is directing, other business activities related to the Accused Instrumentalities to the State of Virginia. For example, Infoblox maintains and operates servers in Northern Virginia and also directs service traffic related to Infoblox's Network Identity Operating System ("NIOS") to servers in Northern Virginia, as shown below and in Infoblox's related documentation:



**Image**: The geographic locations of Infoblox PoP servers.

https://docs.infoblox.com/space/BloxOneThreatDefense/35408116/Forwarding+DNS+Traffic+to+Infoblox+Platform. Infoblox further describes that the "service location" is "where the service is hosted." https://docs.infoblox.com/space/BloxOneDDI/682852382/Configuring+NIOS-X+as+a+Service. For example, "AWS US East (N. Virginia)."*Id.* Infoblox's informational DDI video tour shows exemplary instances of the Accused Instrumentalities where the service location is identified as "AWS US (N. Virginia)":



https://docs.infoblox.com/space/BloxOneDDI/847085580/Demo+of+New+Infoblox+Portal.

13.     On information and belief, Infoblox has conducted and does conduct substantial business in this District, through its Herndon office, employees, agents, representatives, resellers, partners or intermediaries, including but not limited to: (i) the acts of infringement alleged in this Complaint; (ii) purposefully and voluntarily placing Accused Instrumentalities into the stream of commerce with the expectation that they will be purchased by and used by consumers in this District; and/or (iii) regularly doing or soliciting business, engaging in other courses of conduct, such as participating in policy making, development of NIST guidance, and/or promotion of DNS services and products, and/or deriving substantial revenue from products and services provided in Virginia and in this District. Accordingly, Infoblox has committed acts within this District giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over Infoblox would not offend traditional notions of fair play and substantial justice.

## FACTUAL ALLEGATIONS

### I.    ASSERTED PATENT

14.     United States Patent No. 8,898,773 is entitled "Applianced Domain Name Server." The United States Patent and Trademark Office duly and legally issued the '773 Patent on November 25, 2014, from U.S. Patent Application No. 11/688,594, filed on March 20, 2007. The '773 Patent claims priority to Finnish patent application FI 20065179, filed on March 20, 2006.

15.     A true and correct copy of the '773 Patent is attached hereto as Exhibit A and is incorporated by reference.

16.     The named inventors are Ville Kummu, Petri Aukia, and Juha Holkkola. Mr. Holkkola co-founded the company that became FusionLayer, a Finnish network infrastructure software company that developed pioneering DNS security and IP address management technology. FusionLayer's innovations addressed inherent security weaknesses in DNS service deployments by integrating attack detection, automated response, and OS-level hardening directly

into the DNS server appliance—an approach that was novel at the time of the invention and that the '773 Patent protects.

17.    The '773 Patent was originally assigned to NIXU Software Oy, which later changed its name to FusionLayer Oy; FusionLayer Inc. is the registered name of FusionLayer Oy in Finland.

18.    FusionLayer Oy transferred its entire right, title, and interest in the '773 Patent, including all claims for past infringement, to NIXU FL IP Protection LLC by a patent assignment agreement effective April 17, 2025. NIXU is the current owner of the '773 Patent and holds all substantial rights in and to the '773 Patent, including the exclusive right to assert all causes of action under the '773 Patent and the exclusive right to any past or future remedies for the infringement of the '773 Patent.

19.    The '773 Patent explains DNS service is a "public, distributed, database which maps domain names to IP addresses." Exhibit A at 1:19-20. "Because public DNS service requires that both the authoritative and the caching name servers are open to the public network, they are vulnerable to hacking attempts and other network security threats." *Id.* at 1:29-33.

20.    The '773 Patent generally relates to "techniques for improving immunity of domain name servers against denial-of-service (DoS) attacks and other types of network security threats." Exhibit A at 1:7-10.  It is directed to a specific technological solution to the technological problems public-facing DNS servers faced, namely, reducing a public-facing DNS server's vulnerability to attack. For example, "the platform-hardening approach and the technique of installing software fixes tend to be mutually incompatible," and "[t]he very act of hardening the DNS platform also makes it harder to install software fixes to the DNS platform." *Id.* at 1:62-67. Further, "responding

to DoS attacks by increasing the throughput and/or redundancy of DNS servers [was] a dead end." *Id.* at 2:11-12.

21.    The '773 Patent describes a DNS server that provides attack detection logic to apply predetermined attack detection rules. *Id.* at 5:5-11. If an attack is detected, the local response logic responds according to predetermined responses. *Id.* at 4:56-57. For example, a local response logic may block, drop, or temporarily suspend traffic from the attacking client. *Id.* at 4:56-5:3, 5:20-22. When the attack response logic ceases "to react to other traffic originating from the attacking device for a predefined period of time," it "effectively creates an illusion of a successful attack by imitating a non-responsive and/or crashed public DNS server." *Id.* at 2:24-28. The patent further describes "[t]he attack detection logic in turn checks each incoming packet based on some or all of the rules described above. If an incoming packet triggers an alert based on one of the detection rules, the attack detection logic may add a new rule to the firewall, the new rule barring packets having the same IP address from which the alert-triggering packet was sent. *The firewall passes normal packets, ie, packets which do not cause alerts by triggering any of the detection rules, to their destinations without taking any actions*. A benefit of this implementation is that attacks from the affected IP address fail to penetrate any further than the firewall and do not cause undue load to the DNS server." *Id*. at 5:5-17 (emphasis added).

22.    By integrating hardening, detection, and response into an applianced package, the '773 Patent simplifies deployment, enhances security, and overcomes the difficulty of updating hardened DNS platforms. For example, Claim 3 of the '773 Patent is directed to:

> A software installation package for a domain name server, the software installation package comprising:
>
> a hardened operating system;
>
> a securely pre-configured domain name server software;

a management interface;

a local attack detection logic, wherein the attack detection logic performs one or more analyses, each of which being based on a plurality of IP packets from an individual client computer, based on a predetermined set of attack detection rules,

wherein, if at least some of the analyses, which are based on the plurality of IP packets from the individual client computer, identify the individual client computer as an attacking client computer, the local attack detection logic blacklists the individual client computer as an attacking client computer thereby indicating that IP traffic from the individual client computer should be blocked, and

wherein the software installation package is stored in a tangible software carrier that constitutes a non-transitory storage medium.

23.     The '773 Patent also discloses "a DNS software installation package[,] which comprises an automated process for updating software used in the software installation package after installation and hardening [and] provides an improved technique for installing software upgrades." *Id.* at 5:65 -6:2.

24.     The inventions claimed by the '773 Patent address these technological problems and provide technological solutions to issues specific to public-facing DNS servers that were not well-understood, routine, or conventional at the time of the inventions. The disclosures and claims are drawn to solving specific, technical problems related to public-facing DNS servers, as a person of ordinary skill in the art reading the '773 Patent and its claims would understand. Moreover, a person of ordinary skill in the art would understand that the claimed subject matter represents advancement in the technical fields of the patent and provides improvements over the prior art and inventive concepts. The claims do not preempt all techniques for or approaches to accomplishing the same or a similar end to what they recite, for example, including techniques or approaches in the prior art. The patent examiners found that none of the prior art cited by the patent disclose or render obvious the claimed inventions, including, for example, Infoblox's published patent

application, which is cited on the face of the '773 Patent (*see* 2004/0210672 Pulleyn et al. dated October 21, 2004 ("Infoblox Patent Publication")). The Infoblox Patent Publication acknowledges a vulnerability to attack. (Infoblox Patent Publication at [0012].) Yet the Infoblox Patent Publication does not describe the inventive concepts contained in the '773 Patent, as evidenced by the patent examiners' allowance of the '773 Patent over the Infoblox Patent Publication. This is further evidence that the claimed inventions were not well-understood, routine, or conventional at that time of said inventions.

25.    On information and belief, it was not until almost ten years after its 2004 Infoblox Patent Publication, on December 9, 2013, that Infoblox announced its "***first*** DNS appliance that can protect itself." Exhibit I (Press Release) (emphasis added). At that time, Infoblox explained "the Infoblox Advanced DNS Protection solution, the first Domain Name System (DNS) appliance with integrated defenses against Distributed Denial of Service (DDoS) attacks, cache poisoning, malformed queries, tunneling and other DNS security threats. *By building defense directly into a fortified DNS server*, *the Infoblox solution can deliver protection that is stronger, more intelligent and more comprehensive **than what is possible today** with separate external security solutions*." *Id.* (emphasis added). Infoblox acknowledged that "*[t]raditional approaches* to network security don't emphasize protection of this critical infrastructure, which may leave DNS vulnerable to internal and external attacks." *Id.* (emphasis added). Infoblox further described Advanced DNS Protection as a "*[u]nique threat detection and mitigation*. Infoblox Advanced DNS Protection *intelligently analyzes* incoming DNS queries and is able to distinguish between legitimate traffic from real users and malicious traffic generated by a DNS DDoS attack. Armed with this information, the Infoblox appliance then *drops the DDoS traffic* and *only responds to the legitimate queries*. This can keep a business online and functioning during a DDoS attack, unlike

*conventional response rate limiting* which *slows down all traffic* by simply placing a cap on DNS query responses." *Id.* (emphasis added). This is further evidence that the claimed inventions were not well-understood, routine, or conventional at that time of said inventions, or even as late as 2013 when Infoblox launched its Advanced DNS Protection.

26.    During prosecution, the applicants explained "the terms 'hardening' and 'hardened,' as modifiers of an operating system, are terms of art readily understood by one of ordinary skill in the art," and further stating:

> Hardening (computing), the process of securing a system --> In computing, hardening is usually the process of securing a system by reducing its surface of vulnerability. A system has a larger vulnerability surface the more that it does; in principle a single function system is more secure than a multipurpose one. Reducing available vectors of attack typically includes the removal of unnecessary software, unnecessary usernames or logins and the disabling or removal of unnecessary services.
>
> There are various methods of hardening Unix and Linux systems. This may involve, among other measures, applying a patch to the kernel such as Exec Shield or PaX; closing open network ports; and setting up intrusion-detection systems, firewalls and intrusion prevention systems. There are also hardening scripts and tools like Bastille Linux, **LASS** [I] for Solaris systems and Apache/PHP Hardener [2] that can, for example, deactivate unneeded features in configuration files or perform various other protective measures.

August 20, 2010 Response to Non-Final Office Action at 4.

27.    Infoblox is not licensed to the '773 Patent, expressly or impliedly.

## II.    INFOBLOX'S KNOWLEDGE OF THE ASSERTED PATENT

28.    Infoblox had knowledge of the Asserted Patent prior to the filing of this suit.

29.    On or about June 2023, a representative of Warburg Pincus ("Warburg") approached Juha Holkkola, who (as explained above) is a named inventor of the '773 Patent and co-founder of FusionLayer. Warburg professed to be "long-time admirers of FusionLayer and the

critical role [its] solutions play in managing the complex networks of organizations around the world" and sought a meeting.

30.     Warburg expressed interest in purchasing FusionLayer and executed a non-disclosure agreement ("NDA") to obtain access to non-public information about FusionLayer. Parag Gupta signed the NDA for Warburg. On information and belief, Mr. Gupta is now—and was in 2023—a director of Infoblox. The NDA explains the Parties were considering a possible business relationship or transaction and agreed to exchange certain non-public information concerning financial and other information related to the business.

31.     At least as of December 1, 2020, Warburg was a substantial investor in Infoblox, Inc., reportedly owning a 50% stake. Exhibit B (Press Release: Warburg Pincus and Vista Equity Partners Close Infoblox Transaction).

32.     FusionLayer retained Corum Group in 2023 to explore the possibility of a sale. On information and belief, to assist with due diligence, Corum Group provided Warburg and Infoblox with access to a virtual data room that included substantial information about FusionLayer's technology and a listing of FusionLayer's patents, including the Asserted Patent.

33.     On or around August 21, 2023, a meeting was held via Microsoft Teams between Warburg, Infoblox, and FusionLayer. At that meeting, Mr. Holkkola presented key information about FusionLayer and its patented technology. The meeting invitation included representatives of Warburg, several representatives of Infoblox, and Mr. Holkkola. On information and belief, at least Padmini Kao, who serves as Infoblox, Inc.'s Executive Vice President of Engineering, attended the meeting with Mr. Holkkola.

34.     Ms. Kao's role and background is described on Infoblox's website as follows:

**Padmini Kao**
**Executive Vice President, Engineering**

Padmini has a strong network security background and brings over 20 years of extensive experience in leadership engineering management roles, building and leading global teams. She is responsible for driving Infoblox's technology strategy and executing the company's technology innovations and product development. Padmini started her Infoblox career in 2013 as senior director of engineering and has been instrumental in building a modern cloud-native architecture and reshaping DDI and security for cloud-first deployments. She previously held engineering management roles at STEC and Blue Coat Systems (now Broadcom). She holds a Master of Computer Science from Louisiana State University, Baton Rouge.

https://www.infoblox.com/company/. After learning as much as it could about FusionLayer's patented technology, neither Warburg nor Infoblox moved forward with the transaction or obtained a license to the Asserted Patent.

35.     On December 9, 2025, an e-mail was sent to Infoblox's general counsel, Wei Chen, to explore interest in a discussion and presentation. No response was received at that time. Almost two months later, on January 30, 2026, NIXU filed a patent infringement suit against Infoblox, Inc., Infoblox Germany GmbH, and Nomios Germany GmbH in the United Patent Court related to EP 2 005 696, which shares priority with the '773 Patent ("UPC Action"). The materials provided in connection with the pending UPC Action provided Infoblox with further information pertaining to its infringement.

36.     Before filing the instant lawsuit, NIXU again offered Infoblox a license to its patent portfolio, including the Asserted Patent, on reasonable terms. Infoblox refused.

37.     NIXU brings the instant patent infringement action to obtain a finding that Infoblox has infringed the Asserted Patent and to recover the significant damages it has incurred as a result of Infoblox's willful and ongoing infringement.

## III.    INFOBLOX'S INFRINGING ACTIVITIES

38.    NIXU realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

39.    An Infoblox NIOS whitepaper explains that "Infoblox NIOS™ software is at the heart of Infoblox solutions. Deployed on Infoblox's high-performance core network services appliances, this software overcomes the service delivery problems and management deficiencies of current solutions. Today's core network services tend to reside on vulnerable, general-purpose operating systems and servers managed by disparate entities throughout an organization, making services difficult to update, manage, and secure both at the local level and system-wide. This situation is now reaching a crisis point." (Exhibit C ("Infoblox NIOS Software, Powering Nonstop Network Services").)

40.    On information and belief, Infoblox makes, builds, develops, installs, configures, uses, runs, distributes, offers for sale, sells within the United States, and/or imports into the United States, solutions based on its NIOS software platform. Infoblox defines NIOS as "[a]n Infoblox proprietary system that powers Infoblox solutions with an embedded processor that delivers core network services. It is the operating system that runs on the NIOS appliances—a security-hardened, real-time set of appliances built to ensure the non-stop operation of network infrastructure." Exhibit D (NIOS 9.0.x Documentation at 59). On information and belief, NIOS is the main platform on which Infoblox's core network services run, including its Domain Name System ("DNS"), Dynamic Host Configuration Protocol ("DHCP"), and IP Address Management ("IPAM") functionalities. NIOS is a software-appliance platform through which Infoblox implements DNS service deployments, including a hardened operating system, preconfigured DNS-related software modules, integrated management functionality, attack detection, and response capabilities.

41.    Infoblox explains: "[t]he most common service targeted by application-layer attacks is DNS. In addition to targeting the DNS service itself, cybercriminals rely on it to infect devices, propagate malware, and exfiltrate data. Intruders often use DNS as a pathway to exfiltrate data because it's commonly overlooked by security solutions that focus on firewalls, IDSs, and proxies." https://insights.infoblox.com/resources-brochures/infoblox-brochure-federal-brochure.

42.    Infoblox's Grid Manager is "[t]he NIOS web interface that provides access to your Grid for performing IPAM, DNS, and DHCP management and other administration tasks." Exhibit D (NIOS 9.0.x Documentation at 55). As such, the Grid Manager constitutes a management interface within the NIOS software-appliance platform. *See* Exhibit E (Exemplary Claim Chart).

43.    NIOS automates error-prone and time-consuming tasks associated with deploying and managing DNS service deployments and related network services, thereby improving reliability and operational efficiency. Exhibit D (NIOS 9.0.x Documentation at 59). NIOS comprises a software-appliance package that includes a hardened operating system and preconfigured software modules, consistent with the software installation package and the hardened operating system described in the '773 Patent.

44.    Infoblox's DNS Protection includes an attack detection logic confirmed to perform multiple analyses based on defined rules. *See* Exhibit E. Further, "[w]hen Infoblox detects new threats, it creates rules and updates the Advanced DNS Protection." Exhibit F (Advanced DNS Protection). Infoblox further explains that its DNS infrastructure protection solution employs rule-based mechanisms "to detect, report upon, and stop DoS (Denial of Service), DDoS (Distributed Denial of Service), and other network attacks targeting DNS authoritative applications." Exhibit D (NIOS 9.0.x Documentation at 1781).

45.     Infoblox's Advanced DNS Protection ("ADP") system includes rule-based blacklisting mechanisms that identify individual client computers as attacking client computers and block their traffic. According to Infoblox's documentation, "[t]he action for all blacklisting rules is set as Drop, where the appliance drops the packets and logs the activity when such an event occurs." Exhibit D (NIOS 9.0.x Documentation at 1793). Additionally, custom rules can be configured to "blacklist, whitelist, pass message types, or enforce rate limiting based upon an attribute like FQDN or an IP address." *Id*. at 1793-1794. When Infoblox's rate algorithm is set to "blocking," the system blocks all traffic from any client computer whose packets per second exceed the configured threshold—a mechanism Infoblox colloquially refers to as the "penalty box." Exhibit G (Advanced DNS Protection Ruleset Tuning at 8). These rule-based mechanisms perform analyses based on a plurality of IP packets received from individual client computers and, upon identifying an individual client computer as an attacking client computer, blacklist that client computer such that IP traffic from that client computer is blocked.

46.     Infoblox describes "more than 2,500 rules" in its ADP system. Exhibit H (November 19, 2019 Infoblox Blog Post). "The majority of these rules are explicitly DNS whilst others protect services like BGP/OSPF/ICMP. The default, like many firewalls, is to drop incoming packets. This means that there are also pass rules. So a DNS query, if it is not subjected to rate limiting, dropping due to anomalous protocol conformance, needs to be explicitly passed." *Id.* These rules constitute a predefined set of rule-based conditions used to evaluate network traffic. Infoblox further explains: "Custom rules for UDP or TCP are based upon your security needs. They can blacklist, whitelist, pass message types, or enforce rate limiting based upon an attribute like FQDN or an IP address." *Id.*; *see also* Exhibit D (NIOS 9.0.x Documentation at 1813).

47.    Infoblox provides further information about ADP on its YouTube channel. For example, "Infoblox Advanced DNS Protection Demo Video" shows the use of blacklisting rules, as depicted in the below screenshot:



https://www.youtube.com/watch?v=PR6Sv-buoP8. The platform is further explained in the video "Infoblox Threat Defense™: Investigating SOC Insights and Mitigating Threats Using Custom Lists," *available at* https://www.youtube.com/watch?v=2Ufoj1NmAAE, which further demonstrates the use of blacklisting:



Each threat protection rule includes configurable "Packets per second" and "Packet size" threshold parameters that define when the system triggers a response action against a client computer's traffic. Exhibit D (NIOS 9.0.x Documentation at 1796-97). These threshold parameters define criteria applied to analyses of network traffic, including analyses based on a plurality of IP packets received from client computers. The "Packets per second" parameter defines the rate limit for incoming packets before the appliance performs a triggered action, and the "Packet size" parameter defines a size threshold for detecting oversized DNS queries indicative of attacks such as tunneling or amplification. *Id.*

48.     Infoblox's NIOS is available in various versions (including, for example, "NIOS 8.x" and "NIOS 9.x," as well as "vNIOS" and "NIOS-X"). While the versions may differ in certain architecture and deployment options, they provide substantially the same core functionality relevant to DNS service deployments, including security, management, and automation features.

COMPLAINT FOR PATENT INFRINGEMENT                                                    PAGE 19

49.    Infoblox's appliances include physical appliances and virtual appliances. Exhibit F; Exhibit E. Infoblox defines "NIOS Virtual Appliance" as "[a]ny Infoblox supported platform, such as AWS, VMWare, Azure appliances that runs the vNIOS software. These appliances are also known as the vNIOS appliances." Exhibit D (NIOS 9.0.x Documentation at 59). These physical and virtual appliances implement the NIOS software-appliance package across different deployment environments. Infoblox distributes NIOS as a downloadable software image from its support website, where the package is stored on Infoblox's servers. Exhibit D (NIOS 9.0.x Documentation at 72). For physical appliances, the NIOS software is stored on the appliance's internal storage hardware. For virtual appliances, the NIOS software image is stored on the virtual machine's disk storage. *See* Exhibit E.

50.    Infoblox further describes that "[y]ou can install Infoblox vNIOS software on any supported virtual platform and configure the system as a vNIOS virtual appliance." *Id.* Infoblox offers its NIOS platform in different product forms, including, but not limited to:

- downloadable NIOS software;

- Infoblox DNS Infrastructure Protection (formerly called Advanced DNS Protection solution);

- physical servers with the necessary hardware with Infoblox software solutions pre-installed;

- cloud-based SaaS solutions operated by and delivered from Infoblox-managed cloud infrastructure; and

- a virtual appliance running in public cloud environments (e.g., AWS, Azure, Google Cloud, Oracle Cloud) running on virtual machines within third-party cloud environments.

These various forms distribute and implement the NIOS software-appliance package across multiple deployment models. On information and belief, Infoblox provides an automated process for updating the software used in the NIOS installation package after installation and hardening. According to Infoblox's documentation, "[w]hen Infoblox detects new threats, it creates rules and updates the Advanced DNS Protection." Exhibit F. New system rules are added through automated rule updates that are distributed to deployed appliances. In addition, NIOS supports automated software upgrade processes, including scheduled upgrades distributed across Grid members, consistent with the claimed automated process for updating software after installation and hardening in the '773 Patent. Exhibit D (NIOS 9.0.x Documentation at 376).

51.     On information and belief, Infoblox sells and distributes the Accused Instrumentalities itself and through third party resellers, distributors, and partners, such as, for example, Carahsoft, who in turn market, sell, and distribute the Accused Instrumentalities in various forms to others.

52.     Infoblox has advertised and continues to advertise its Accused Instrumentalities on its website. These advertisements promote Infoblox's Accused Instrumentalities and encourage customers and end-users to purchase, deploy, configure, and use them in accordance with the description in the preceding paragraphs.

53.     On information and belief, Infoblox also provides extensive technical support, DNS services, and resources needed to implement its Accused Instrumentalities, including via its website. For example, Infoblox provides events, webinars, YouTube videos, product manuals, whitepapers, help boards, blog posts, updates, and direct customer support. On information and belief, these resources instruct and encourage customers and end-users to deploy and use Infoblox's NIOS-based solutions.

54.     Infoblox Federal, Inc. specifically markets the Accused Instrumentalities as "solutions for federal networks," and describes that it "is the global leader in providing Secure DNS and Cloud Managed Network Services for a wide array of both Federal agencies and State and Local governments." https://insights.infoblox.com/resources-brochures/infoblox-brochure-federal-brochure. On information and belief, Infoblox Federal, Inc. *at least* provides, builds, delivers, designs, deploys, installs, configures, offers for sale, and/or sells within the United States, and/or imports into the United States, the Accused Instrumentalities to customers, including government entities and agencies. On information and belief, Infoblox Federal, Inc. also obtains certifications for its offerings and implementations of the Accused Instrumentalities—such as IOL USGv6 certification (DHCPv6) and NIST certifications—and also ensures compliance with industry and governmental standards—such as: DISA Security Technical Implementation Guide (STIG),  NSA Systems and Network Attack Center (SNAC), Federal Information Security Management Act (FISMA), and Cryptographic Module Validation Program. *Id.*

## COUNT I: INFRINGEMENT OF THE '773 PATENT

55.     NIXU incorporates by reference and realleges each of the preceding paragraphs as if specifically set forth herein.

56.     Infoblox has and continues, without authorization, to make, develop, configure, operate, use, distribute, offer for sale, sell, and/or induce and contribute to the operation, use, offer for sale, and sale by others, NIOS-based solutions and appliances that practice one or more claims of the Asserted Patent (hereafter "the Accused Instrumentalities"). At a minimum, the Accused Instrumentalities include Infoblox NIOS-based solutions and appliances, including, but not limited to NIOS DDI, the Universal DDI Product Suite, NIOS-based physical and virtual appliances, NIOS software packages (including vNIOS and NIOS-X) and Infoblox DNS Infrastructure Protection (formerly Advanced DNS Protection).

57.     On information and belief, earlier NIOS versions include substantially the same or similar components, features and functionality, at least as of NIOS 6.10.x, the release notes for which described the inclusion of Advanced DNS Protection. On December 9, 2013, Infoblox "introduce[d] the first DNS appliance that can protect itself." Exhibit I (Press Release). Infoblox further described "the Infoblox Advanced DNS Protection solution, the first Domain Name System (DNS) appliance with integrated defenses against Distributed Denial of Service (DDoS) attacks, cache poisoning, malformed queries, tunneling and other DNS security threats. By building defense directly into a fortified DNS server, the Infoblox solution can deliver protection that is stronger, more intelligent and more comprehensive than what is possible today with separate external security solutions." *Id.*

58.     Specifically, in violation of 35 U.S.C. § 271(a), Infoblox has infringed and continues to infringe one or more of the claims of the '773 Patent literally and/or under the doctrine of equivalents, by making, using, offering for sale, selling, and/or importing in the United States, without authority, the Accused Instrumentalities. The Accused Instrumentalities satisfy all claim limitations of one or more claims of the '773 Patent. A claim chart comparing exemplary independent Claim 3 of the '773 Patent to exemplary, representative Accused Instrumentalities (NIOS 9.0.x) is attached as Exhibit E, which is hereby incorporated by reference in its entirety.

59.     In further violation of 35 U.S.C. § 271(a), Infoblox has infringed and continues to infringe the method of Claim 1 of the '773 Patent, literally and/or under the doctrine of equivalents, by making, using, offering for sale and selling in the United States, without authority, the Accused Instrumentalities. A claim chart comparing exemplary independent Claim 1 of the '773 Patent to exemplary, representative Accused Instrumentalities (NIOS 9.0.x) is attached as Exhibit E, which is hereby incorporated by reference in its entirety. For example, on information and belief,

Infoblox, Inc. makes, builds, forms, deploys, configures and/or provides NIOS software installation packages and/or the physical and virtual appliances storing NIOS software installation packages. On information and belief, Infoblox Inc. and Infoblox Federal, Inc. distribute NIOS software installation packages to their respective customers and end-users. On information and belief, Infoblox Inc. also provides NIOS-X as a service. https://insights.infoblox.com/resources-datasheets/infoblox-datasheet-infoblox-universal-ddi-management.

60.    In violation of 35 U.S.C. §§ 271(b) and 271(c), Infoblox is and has been indirectly infringing one or more of the claims of the '773 Patent, including at least exemplary Claims 1 and 3, by inducing and/or contributing to the direct infringement of end-users and/or its customers, including, but not limited to, third-party resellers, distributors, and partners, such as, for example, Carahsoft.

61.    On information and belief, Infoblox actively, knowingly, and intentionally has induced, and continues to induce, direct infringement of the '773 Patent under 35 U.S.C. §271(b) by instructing and encouraging its end-users and/or its customers, including, but not limited to, third-party resellers, distributors, and partners, such as, for example, Carahsoft. For example, Infoblox provides the NIOS software installation package to its customers who are end users, intending that they install, deploy, configure and use the NIOS software installation package as described in Infoblox's technical materials (*see, e.g.*, Exhibit E) to infringe one or more claims of the '773 Patent. In addition, on information and belief, Infoblox provides technical support and services to ensure that their end-user customers use the NIOS software installation package as intended and described in Infoblox's technical materials (*see, e.g.*, Exhibit E). On information and belief Infoblox induces, its third-party resellers, distributors, and partners  to install, offer for sale, sell, and use NIOS software installation packages and/or to use, offer for sale, sell, and distribute

the Accused Instrumentalities through, at least, the provision of the software installation package, technical materials, and support, and intends that they infringe one or more claims of the '773 Patent.

62.    On information and belief, Infoblox, Inc. has actively, knowingly, and intentionally induced and continues to induce direct infringement of the '773 Patent under 35 U.S.C. § 271(b) by instructing and encouraging Infoblox Federal, Inc. to make, form, install, configure, use, offer for sale, and sell NIOS software installation packages and/or to make, deploy, configure, use, offer for sale, sell and/or import the Accused Instrumentalities (*see, e.g.*, Exhibit E) through, at least, the provision of the software installation package and/or its components, technical materials, and support, and intends that Infoblox Federal, Inc. infringe one or more claims of the '773 Patent.

63.    On information and belief, Infoblox distributes the NIOS software installation package and instructions on how to deploy, configure, and use Accused Instrumentalities in a manner that would directly infringe (*see, e.g.*, Exhibit E).) It further distributes written documentation, product literature, technical support, product demonstrations, trouble-shooting manuals, webinars, in-person events, blogs, conferences, videos, and other sources that instructs, directs, facilitates, and specifies the operation and use of the Accused Instrumentalities to induce end-users and/or its customers, including, but not limited to, third-party resellers, distributors, and partners, to use the Accused Instrumentalities in a manner that would directly infringe. On information and belief, Infoblox also provides services to support such infringing deployment, configuration, and use of the Accused Instrumentalities.

64.    On information and belief, Infoblox, Inc. has had actual knowledge of the '773 Patent, since at least as early as August 2023 following discussions and interactions with Mr. Holkkola. For example, Infoblox, Inc. was provided with access to a virtual data room containing

the '773 Patent and was provided with information about the Asserted Patent's relevance to DNS solutions through materials and Mr. Holkkola's presentation.  Since then, Infoblox, Inc. knew or was willfully blind to the high probability that making, using, selling, offering for sale, and importing the Accused Instrumentalities as directed in its technical materials by Infoblox Federal, Inc. and Infoblox customers and end users would constitute direct infringement of one or more claims of the '773 Patent. Additionally, *no later than* NIXU's filing of the UPC Action against Infoblox, Inc. in January 2026 and/or the filing of this Complaint, Infoblox, Inc. has had actual knowledge of the '773 Patent, and knew or was willfully blind to the high probability that the continued use of the Accused Instrumentalities would constitute infringement of one or more claims of the '773 Patent.

65.    Infoblox Federal, Inc. has had actual knowledge of the '773 Patent and knew or was willfully blind to the high probability that its consumers' and end users' use of the Accused Instrumentalities as directed would constitute infringement of one or more claims of the '773 Patent, at least as of when Infoblox, Inc. obtained such knowledge, given the close relationship with Infoblox, Inc., including their overlapping executives and directors, shared office, and other shared resources, such as technical support and technical materials.

66.    In violation of 35 U.S.C. § 271(c), Infoblox knowingly or being willfully blind, has contributed, and continues to contribute, to the direct infringement of one or more claims of the '773 Patent by its end-users and customers. Infoblox sells the NIOS system, which is at least a component of the patented product in Claim 3 and/or is used in practicing the patented process of Claim 1. The NIOS system is at least a material part of the claimed inventions (*see, e.g.*, Exhibit E). For example, the infringing attack detection logic is the core of Infoblox's NIOS system, without which the DNS server would be vulnerable to attacks and rendered useless to provide DNS

services in the event of an attack. Thus, the NIOS system is especially made or adapted to use the infringing attack detection logic as claimed in the '773 Patent and is not a staple article or commodity suitable for non-infringing uses (*see* Exhibit E). The core DNS functionality of the NIOS system implements the patented invention and relies on its use to function. By selling the NIOS system to its customers and end users, Infoblox contributed to their direct infringement. Similarly, by providing, distributing, and/or selling the NIOS system to Infoblox Federal, Inc., Infoblox contributed to Infoblox Federal, Inc.'s direct infringement.

67.    On information and belief, before this suit was filed, Infoblox knew of, or was willfully blind to, the '773 Patent and that the induced acts constitute direct infringement of at least one claim. For example, Infoblox and Mr. Holkkola communicated about the technology; and, on information and belief, Infoblox was provided access to a virtual data room identifying and containing information about the Asserted Patent. Information was also provided about the patent's relevance to DNS servers through at least Mr. Holkkola's meeting with and presentation to Infoblox. In addition, NIXU's filing of the UPC Action against Infoblox, Inc. in January 2026 and related communications before this suit was filed, provided Infoblox, Inc. with further information identifying the '773 Patent and the acts that constitute infringement of the claimed elements, such that Infoblox knew of, or was willfully blind to, the '773 Patent and that the induced acts constitute direct infringement of at least one claim, at least as of the date of the UPC Action.

68.    Infoblox Federal, Inc. knew of, or was willfully blind to, the '773 Patent and that the induced acts constitute direct infringement of at least one claim, at least as of when Infoblox, Inc. obtained such knowledge, given its close relationship with Infoblox, Inc., including their overlapping executives and directors, shared office, and other shared resources, such as technical support and technical materials.

69.     Infoblox's direct infringement of the '773 Patent has been and is willful and deliberate. As alleged above, Infoblox knew or should have known that its actions infringe directly.

70.     Infoblox's acts of infringement have caused, and continue to cause, damage to NIXU, and NIXU is entitled to recover from Infoblox the damages it has sustained as a result of those wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty for the use made of the invention in the '773 Patent.

## DEMAND FOR JURY TRIAL

71.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure and Local Civil Rule 38, NIXU demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, NIXU prays for the following relief:

a.     A judgment in favor of NIXU that Infoblox has directly and indirectly infringed the Asserted Patent, literally or under the doctrine of equivalents, as alleged above;

b.     A judgment that Infoblox's infringement of the Asserted Patent has been and is willful;

c.     An award for all damages arising out of Infoblox's infringement, to adequately compensate NIXU for Infoblox's infringement of the Asserted Patent, but in no event less than a reasonable royalty, and supplemental damages for any continuing post-verdict infringement up until entry of the final judgment, in an amount according to proof;

d.     An award of pre-judgment and post-judgment interest, in an amount according to proof;

e.     An award of enhanced damages and/or attorneys' fees under 35 U.S.C. §§ 284 and 285 should Defendants' conduct warrant or as otherwise permitted by law;

f.      An award of NIXU's statutory costs; and

g.      An award of any such other costs, equitable relief, and any other relief to which NIXU is entitled and as the Court deems just and proper.

Dated: May 19, 2026                              Respectfully submitted,

                                                 */s/ John M. Erbach*
                                                 John M. Erbach (Va. Bar No. 76695)
                                                 **SPOTTS FAIN, P.C.**
                                                 411 East Franklin Street, Ste 600
                                                 Richmond, Virginia 23219
                                                 Tel: (804) 697-2000
                                                 Fax: (804) 697-2100
                                                 jerbach@spottsfain.com

                                                 Miranda Y. Jones (*pro hac vice* forthcoming)
                                                 David W. Higer (*pro hac vice* forthcoming)
                                                 Ryan Short (*pro hac vice* forthcoming)
                                                 **WINSTEAD PC**
                                                 2728 N. Harwood Street, Suite 500
                                                 Dallas, Texas 75201
                                                 Tel.: (214) 745-5400
                                                 Fax: (214) 745-5390
                                                 mjones@winstead.com
                                                 dhiger@winstead.com
                                                 dneal@winstead.com
                                                 rshort@winstead.com

                                                 *Attorneys for Plaintiff*
                                                 *NIXU FL IP Protection LLC*

COMPLAINT FOR PATENT INFRINGEMENT                                    PAGE 29